## SEVERANCE *v.* HEALEY & A.

The U. S. act of March 3, 1865, does not contemplate the forfeiture of citizenship as a penalty for desertion, until after conviction of the crime of desertion before a court-martial.*

CASE, by Hezekiah M. Severance against Sullivan W. Healey and others, defendants, as selectmen of the town of Washington, for refusing

---

* The above decision is sustained by *Gotcheus* v. *Matheson*, 58 Barb. 152.

to put the name of the plaintiff on the check-list of voters in said town at March meeting, 1868.  Plea, not guilty.  The defendants offered testimony tending to prove that the plaintiff was a deserter from the United States army during the late war of the rebellion, and contended that he was not entitled to vote, or to have his name upon the check-list of the town of Washington, under the provisions of the 21st section of the act of congress relating to that subject, approved March 3d, 1865, and the proclamation of the president of the United States issued thereon, dated March 11, 1865.  The plaintiff contended that said law of congress was unconstitutional ; that it was not binding upon the defendants ; and that the fact of desertion, if proved, did not disqualify the plaintiff to vote.  But the court ruled that said law of congress was constitutional and binding upon the defendants, and that if the plaintiff was a deserter under said law of congress he was not entitled to vote ; to which ruling plaintiff excepted.

Plaintiff claimed that the only competent evidence that he was a deserter, which could be laid before the selectmen or the court, was a record, or copy of a record, of his conviction by some competent tribunal of the crime of desertion ; but the court ruled that the fact of desertion might be proved by proving such facts as would constitute desertion, and that those facts might be proved by the admissions of the plaintiff ; to which plaintiff excepted.  Subject to the above exceptions, a verdict was ordered for the defendants, which the plaintiff moved to set aside.

*Burke, Wheeler, Briggs & Harnden,* for plaintiff.

*Cushing* (with whom was *Tappan*), for defendants.

From the discussion of this case, we infer that the chief point of difficulty is the construction of the statute, it being suggested that the disfranchisement was an additional penalty to follow upon conviction by court-martial.  We had not much considered this point, because it seemed to us the result of the application of technical rules to control what we never doubted was the real intention of the makers of the statute.  It was suggested, as we understood, that the statute was to be construed in connection with other statutes relating to the crime of desertion, and which were *in pari materia*, and that, as the penalties imposed by those statutes were (by the express terms, we believe) to follow conviction, therefore this statute must have a similar construction.  We believe, however, that the statute is not strictly *in pari materia*.  It embraces the crime of not returning within sixty days, and, further, " embraces all persons who hereafter, being duly enrolled, shall depart the jurisdiction of the district in which he is enrolled, or go beyond the limits of the United States with intent to avoid any draft into the military or naval service, duly ordered."  We have been unable to find any previous statute by which either of these acts is made a crime, or by which any court is authorized to try them.  Such persons are " deemed and taken to have voluntarily relinquished and

forfeited their rights of citizenship, and their right to become citizens."
The act by which desertion is forbidden and punished (expressly, as
we remember it) gives the jurisdiction over the offence to the court-
martial; and the conscription act, as it is called, provided that the sen-
tences of courts-martial may be carried into effect without the approba-
tion of the president, if approved by the general commanding.

Now it seems to us pretty clear that the two offences *created* by the
statute under consideration cannot be tried or punished by any juris-
diction provided by law. If this be so, the inference seems to us
irresistible, that, by the true construction of the statute, these crimes
effect a change in the legal *status* of the offender, and that his new
*status* must be recognized by every tribunal to the notice of which it is
brought. We are not without examples of similar legislation. The
" 14th amendment," as it is called, to the constitution of the United
States, inflicts certain severe disabilities on a large class of persons
guilty of treason to the United States, and liable to punishment
as traitors by the courts of the country. If one of those men
should present himself as a member elect to the legislature of this
State, or should be in court justifying his acts as an executive
officer of the State, and the objection were made that he was dis-
qualified under the 14th amendment, would it be any answer for
him to say that his disability could only be proved by the record of
a conviction in a court of the United States for treason ? If we are
not mistaken, the " reconstruction act," as it is called, contains simi-
lar legislation. It is according to our recollection of the statute that
similar disabilities are by it attached to classes of persons guilty of
offences, many or all of which were already punishable by law, and
for the trial of which there was ample power in the courts of the
United States. This legislation seems to us strictly *in pari materia*
with the statute under consideration.

These were all laws designed to operate upon large classes of indi-
viduals whom it was practically difficult or impossible to bring to trial.
The crime of desertion was punishable by death at the time when this
statute was passed, and there was little need of adding disfranchise-
ment to that penalty. It was seen that large numbers of deserters,—
out of the reach of the authorities, and either in the confederate states
or out of the country, and relying upon the expectation that after the
close of the war they might return to their homes and escape prosecu-
tion,—might be influenced by the fear that these disabilities would
hang over them always, and might be enforced against them whenever
and wherever there might be occasion. It was a kind of legislation
which might well seem appropriate at the time when the statute under
consideration was passed, and well adapted to the emergency. The
suggestion is made that it is inconvenient that these disabilities should
be tried by the selectmen. It should, however, be remembered, that
the duty is imposed upon the selectmen of trying questions much more
difficult of investigation. Every man who presents himself for regis-
tration has his case to make out, and his citizenship, and his right of
voting to establish. The judgment of the selectmen concludes nothing

excepting the right to that particular registration. If wrongfully denied, there is a remedy in the courts of law ; and the voter who is excluded to-day, may be received at the next registration if there has been a mistake. We have no doubt that there are cases where the rules of construction were held to require that the actual intention of the law-makers should be set aside. We happen to know at least of one instance in the senate of New Hampshire, where an amendment to a statute in course of enactment was made on motion of a senator and carried for a purpose expressed by him, and was afterwards held by the court to mean the exact contrary to his intention. In view of the suggestions we have made, it seems to us that the technical rules of construction do not require that the real intention of the legislature, as we deem it to have been, should be defeated, and the statute practically nullified. We say *practically nullified,* because, if it be true that courts-martial might now be detailed for the trial of these offenders, we think it quite certain that very few of them would ever be reached.

SMITH, J. In *Huber* v. *Reily,* 53 Penn. State 112, it was held, by a majority of the court, that the U. S. act of March 3d, 1865, imposing forfeiture of citizenship as an additional penalty for desertion, does not deprive any person of citizenship except after conviction of the crime of desertion before a court-martial. This view of the intention of the statute was adopted in *State* v. *Symonds,* 57 Maine 148 ; and we concur in it for reasons fully stated by STRONG, J°., in delivering the opinion of the majority, in *Huber* v. *Reily.* See, also, *Gardner* v. *Ward,* 2 Mass. 244—in note, 248, 249.

*Lebanon* v. *Heath,* 47 N. H. 353, cited by the defendants, relates to the evidence requisite to prove the fact of desertion when it comes collaterally in question in an action of assumpsit. It is not an authority upon the question whether the act of congress contemplates conviction by court-martial as a prerequisite to the infliction of the penalty of disfranchisement.

If the plaintiff had been convicted of desertion, several important questions would arise : among others, whether such conviction would, without reference to the act of congress, operate to disfranchise him under the constitution of New Hampshire ; and whether the act of congress was intended to have, or can have, any effect upon the deserter's right of suffrage in New Hampshire. But, as we do not understand the defendants to claim that there was any conviction, these points need not be considered.

*Verdict set aside.*